SYNTEX AGRIBUSINESS, INC., Petitioner,

v.

UNITED STATES INTERNATIONAL TRADE COMMISSION; Mitsui and Company, and Alps Pharmaceutical Co., Ltd., Respondents.

Appeal No. 81–8.

United States Court of Customs and Patent Appeals.

Aug. 27, 1981.

Rehearing Denied Oct. 15, 1981.

Matthew J. Travers, Jr., Washington, D. C., for petitioner.

Edward M. Lebow, Washington, D. C., for ITC.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

MILLER, Judge.

Syntex Agribusiness, Inc. ("Syntex") petitions for a writ of mandamus to compel the United States International Trade Commission ("ITC") to institute an investigation under section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337). The petition is denied.

## Background

The article involved in this petition is calcium pantothenate ("cal pan"), the calcium salt of pantothenic acid, which is one of the essential B vitamins and is required in minute amounts in human and animal diet to maintain health and normal growth. Cal pan is a derivative of petroleum.

The optical isomers of cal pan are capable of rotating a beam of polarized light either to the right, dextrorotatory or "d," or to the left, levorotatory or "l." Mixtures of equal parts of "d" and "l" forms are optically inactive and known as racemic or dl-cal pan. It is only the "d" form that has biological activity and is a source of the vitamin d-pantothenic acid.

Both d-cal pan and dl-cal pan are commercially available compounds resulting from the reaction of pantothenic acid and a suitable calcium compound as a source of calcium, with the manufacture of d-cal pan requiring extra processing compared to the manufacture of dl-cal pan. D-cal pan is commercially manufactured principally for use in human nutrition as an ingredient of multivitamin tablets. In animal nutrition, the product is sold principally in the racemic mixture wherein the biological activity is derived only from the d portion of the mixture.

There are two industries in the cal pan market. One is devoted to the manufacture of cal pan which meets the requirements of animal nutrition, i. e., racemic or dl-cal pan. The other is devoted to the manufacture of cal pan which meets the requirements for human nutrition, i. e., d-cal pan.[1]

1. According to Syntex:

Domestic industry sources are in close agreement that the U.S. cal pan market is at a level of about 1,450 metric tons, d equivalent. Based on the Commission's [ITC's] measure of domestic sales in 1973 and 1974 —1,217 and 1,219 metric tons, respectively— U.S. demand for cal pan has increased roughly by 230 metric tons or an average annual rate of 2.6 to 3.1 percent. The value of the U.S. market on the basis of current prices is estimated at $13 million.

Total U.S. imports of cal pan more than tripled during 1974–1979, increasing from about 687,000 pounds in 1974 to 2.5 million pounds in 1979. Japan is the dominant source country, accounting for roughly ¾ to ⅘ of total imports in every year since 1975.

On October 20, 1972, Syntex's predecessor, Hoffman-Taff, Inc., filed a complaint with ITC, then the Tariff Commission, and an investigation (No. AA 1921–131) under section 201 of the Antidumping Act of 1921, as amended (19 U.S.C. § 160), was conducted. In a release dated December 7, 1973, ITC notified the Secretary of the Treasury that a domestic industry was being injured by reason of imports from Japan of cal pan sold at less than fair value. As a result of the ITC's determination, cal pan from Japan sold at less than fair value became subject to special dumping duties.

Subsequent to the 1973 dumping decision, Syntex ceased manufacturing d-cal pan and allegedly sustained severe losses in the manufacture of dl-cal pan.

On June 1, 1979, Syntex filed a complaint with ITC alleging unfair practices in the import trade of cal pan from Japan in violation of section 337. Syntex also alleged that the Department of Treasury, U.S. Customs Service, failed to timely assess dumping duties, which failure aided and abetted the foreign producers or importers. In response, ITC took the position that the alleged acts and effects were solely within the purview of section 201 and voted, on June 27, 1979, to not institute a section 337 investigation. On July 30, 1979, ITC referred the complaint to the Treasury Department, which has responsibility for enforcing the Antidumping Act.

On October 24, 1979, Syntex filed a revised complaint with ITC. Therein, all references to the Department of Treasury, U.S. Customs Service, and failure to implement the Antidumping Act of 1921, as amended, are omitted. The revised complaint contains only allegations of Sherman Act monopolization and of a conspiracy between a Japanese manufacturer, Alps Pharmaceutical Co., Ltd., and an American importer, Mitsui and Company, to restrain trade.

On November 20, 1979, ITC voted to not institute a section 337[2] investigation. However, it recontacted the Treasury Department concerning enforcement of the 1977 ITC determination because there had been no reply to ITC's July 30, 1979, referral.

On December 27, 1979, the Treasury Department responded to ITC's July 30, 1979, referral, saying that: (a) Syntex's original complaint was within the purview of the antidumping act; (b) assessments were fairly current regarding cal pan exports of two Japanese companies, Alps Pharmaceutical and Nippon Roche; (c) there were insufficient records to determine dates of entry for 335 unliquidated entries; (d) additional information from Syntex was requested to determine the propriety of continuing to use home market sales as a basis for determining foreign market value since, in the case of below-cost sales, constructed value may be required; and (e) the Trade Agreements Act of 1979 requirements for annual review of antidumping findings and deposits of estimated duties should provide greater protection to U.S. industries.

On February 12, 1980, ITC voted to dismiss Syntex's revised complaint of October 24, 1979, in accordance with 19 CFR 210.12.[3]

Cal Pan U.S. Market
1,000 Lbs.

| Year | Total | Imports | | U.S. |
|------|-------|---------|-------|----------|
| | | Japan | Other | Products |
| 1974 | 2,677 | 500 | 187 | 1,990 |
| 1979 | 3,190 | 1,900 | 600 | 690 |

2. Syntex states that, in regard to the 1973 ITC dumping determination, it had "formed an opinion and belief that the Department of Treasury, U.S. Customs Service was not assessing dumping duties in accordance with the Antidumping Act of 1921, as amended"; also that it informed ITC on June 27, 1979 (the same day ITC voted to not institute a section 337 investi-

gation) that "approximately 335 entries of cal pan some dating back to 1974 were unliquidated . . . ."

3. 19 CFR 210.12 provides:
   Institution of investigation.
   Within thirty (30) days after receipt of a complaint or, in exceptional circumstances, as soon after such period as possible, the Commission shall determine whether the complaint is properly filed and, if so, shall institute an investigation. The investigation shall be instituted by notice published in the FEDERAL REGISTER, which notice will define the scope of the investigation. If the

The decision was based on section 337(b)(3) which, according to ITC, gave it discretion to institute an investigation "when the Commission had reason to believe that the matter before it was based in part on alleged acts and effects which were within the purview of [the antidumping laws] and in part on alleged acts and effects which may, independently from or in conjunction with those within the purview of such section, establish a basis for relief under [section 337] . . . ."

Also on February 12, 1980, ITC voted to institute a preliminary investigation under section 603 of the Trade Act of 1974 (19 U.S.C. § 2482) of certain aspects of the cal pan market in the United States.

On January 21, 1980, Syntex had filed a petition in this court for a writ of mandamus to compel ITC to institute a section 337 investigation based on its revised October 24, 1979, complaint. On February 21, 1980, Syntex moved that the court stay its consideration of the mandamus petition until ITC completed the section 603 investigation. On March 20, 1980, Syntex appealed to this court from ITC's dismissal of its revised complaint of October 24, 1979, stating the same grounds as those in its mandamus petition. On April 1, 1980, this court denied Syntex's motion for stay and dismissed its petition for a writ of mandamus on the ground that, as a result of the ongoing section 603 investigation, ITC might institute a section 337 investigation, in which case Syntex's petition for writ of mandamus would be moot; or, if ITC decided to not institute a section 337 investigation, Syntex could then petition for mandamus. In denying Syntex's motion to stay, the court pointed out that Syntex did not assert a legal right to an immediate section 337 investigation and that it had acquiesced in the ITC's actions relating to the section 603 investigation. *Syntex Agribusiness, Inc. v. United States International Trade Commission,* 617 F.2d 290 (CCPA 1980).

On July 31, 1980, this court dismissed Syntex's March 20, 1980, appeal on the ground that there had been no final determination by ITC, which is essential for jurisdiction of the court.

On September 19, 1980, ITC notified Syntex that, as a result of its section 603 investigation, it had been determined that there were no section 337 unfair methods of competition. ITC terminated its section 603 investigation and informed Syntex that it would not reconsider its determination.

On January 7, 1981, Syntex filed this petition for writ of mandamus to compel ITC to institute an investigation on the following grounds:

(a) ITC erroneously dismissed Syntex's revised complaint of October 24, 1979, seeking a section 337 investigation;

(b) ITC erroneously instituted a section 603 preliminary investigation; and

(c) ITC's decision that there is no section 337 violation is arbitrary, capricious, and an unreasonable abuse of discretion or otherwise not in accordance with law.

### OPINION

The issue is whether Syntex's revised complaint, filed October 24, 1979, was a "complaint" within the meaning of section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337). This revised complaint is identical to its earlier filed complaint, except that it omits all references to the antidumping act and contains only allegations of Sherman Act monopolization and conspiracy between the Japanese manufacturer and the American importer to restrain trade. Syntex's revised complaint states:

. . . Respondents, and possibly others, beginning since December 1973 and up to and including the date of the filing of this Complaint, have individually, in concert with each other and with others who may be identified by the Commission or who may subsequently become known to the Complainant, conspired, combined, confederated, and agreed with each other

Commission determines that a complaint is not properly filed, the complaint shall be dismissed and the Commission shall notify the

complainant in writing of its action with the reasons therefor.

and with others who may be identified by the Commission or who may subsequently become known to the Complainant, intentionally and purposefully, attempted to and have: (a) destroyed efficiently and economically operated domestic industries in the United States, or monopolized trade and commerce in these goods in the United States, and (c) [*sic* (b)] substantially injured efficiently and economically operated domestic industries . . . by forcing the domestic producers of calcium pantothenate to bid and sell at a loss. The effects of these violations of the law are to and have discouraged domestic producers from manufacturing calcium pantothenate to the substantial injury of trade and commerce in the United States generally and specifically in the manufacture and sale of calcium pantothenate.

ITC, although acknowledging that Syntex's October 24, 1979, complaint contains allegations of conspiracy, states that the complaint "contained almost no factual support for such allegation" and that the complaint was not properly filed under 19 CFR 210.20(a)(2) and (3),[4] because "the Syntex complaint did not provide an adequate factual basis for its conspiracy and monopoly claims, and therefore was not properly filed within the meaning of the applicable rules."

---

4. 19 CFR 210.20(a)(2) and (3) provide:
The complaint.
(a) *Contents of complaint.* In addition to conforming with the requirements of § 201.8 of this chapter and § 210.5(a), § 210.5(b), and § 210.5(c) of this part, the complaint shall—
. . . .
(2) Include a statement of the facts constituting the alleged unfair methods of competition and unfair acts;
(3) Describe specific instances of alleged unlawful importations or sales;
. . . .

5. Syntex does not argue the validity of the quoted provisions of 19 CFR 210.20.

6. Syntex also cites, in its brief in support of its petition for a writ of mandamus, the results of a review of antidumping findings by the U. S. Department of Commerce, International Trade Administration, 45 Fed.Reg. 59933 (September 11, 1980), which show the following price margins (percentage of price reduction from the foreign market value) during particular periods for certain manufacturers and exports of Japanese cal pan to December 31, 1979:

In the absence of definition of the term "complaint" in section 337 or elsewhere *in* the Tariff Act of 1930, as amended, and in light of the procedures for Investigations of Alleged Unfair Practices in Import Trade set forth in 19 CFR 210.1 et seq., as authorized by sections 333 and 335 of the Tariff Act of 1930 (19 U.S.C. §§ 1333 and 1335), it is clear that Syntex's revised complaint must comply with 19 CFR 210.20, which sets forth the requirements for a section 337 complaint.[5] *See Sealed Air Corp. v. U. S. International Trade Commission,* 645 F.2d 976, 987, 209 USPQ 469, 479 (Cust. & Pat.App.1981). Specifically, since Syntex alleges monopolization and conspiracy by Alps and Mitsui, its complaint must comply with 19 CFR 210.20(a)(2) by including a statement of the facts constituting the alleged acts of monopolization and conspiracy.

In sections 8–10 of its revised complaint, Syntex refers to some 23 exhibits in support of the monopolization and conspiracy allegations.[6] Section 8 contains manufacturing, sales, and inventory information in the domestic cal pan industry and lists several exhibits. Syntex asserts that from the data in these exhibits, it is—

abundantly clear that the U. S. industry is being eliminated and that the demands

| | Period | % |
|---|---|---|
| Alps Pharmaceutical Co., Ltd. | 4/1/78 – 3/31/79 | 14.42 |
| | 4/1/79 – 12/31/79 | 0 |
| Mitsui & Co./Alps | 4/1/78 – 3/31/79 | 24.54 |
| | 4/1/79 – 12/31/79 | 18.87 |
| Fallek Chemical/Alps | 4/1/78 – 3/31/79 | |
| | 4/1/79 – 12/ 3/79 | 25.13 |

Syntex points out that from 4/1/79 through 12/31/79, a period spanning the filing date of its June 1, 1979, complaint, Alps showed no price margin and argues that, along with price margins that reflect "well settled unfair trade practices," this "strongly suggests the appearance of market manipulation"; also that such evidence is sufficient support of its petition for ITC to institute a section 337 investigation. However, Syntex did not include this information in its revised complaint. Whether this information alone would be sufficient to constitute a monopolization or conspiracy claim is not an issue before us.

of the marketplace are being met essentially by imports from Japan.

As heretofore noted, prior to the time when cal pan imports from Japan were being sold at less than fair value, there were five companies actively engaged in the manufacture of racemic or dl-cal pan and one of these, the Complainant's predecessor company, was also engaged in the manufacture of d-cal pan.

Today the Complainant is the only current U. S. producer of racemic or dl-cal pan and there are no U. S. companies producing d-cal pan.

Included in section 8 are data showing Syntex's "significant and continued losses during its Fiscal Years 1972–1975," a period during which it "increased its average sales prices approximately 17.5% while concurrently the U. S. Wholesale Price Index increased approximately 50% . . . ."

Also included in section 8 are data comparing prices for Japanese cal pan, based on 1972 prices adjusted for increases in the Japanese Wholesale Price Index, to prices at which it believes Japanese cal pan was actually being sold. From these data Syntex concludes:

> . . . that d-cal pan has been sold at unreasonably low prices subsequent to the Tariff Commission decision of December 7, 1973. It is submitted that the allegations are corroborated by those filed Appraisement Reports required under Section 209 of the Trade Act.

Unfortunately, it is obvious that the assessment of dumping duties has provided inadequate and, indeed, absolutely no relief because of the fact that the Complainant has been forced to terminate the manufacture of d-cal pan.

It can be reasonably anticipated that, having eliminated the U. S. competition, the import price of monopolized d-cal pan will be arbitrarily adjusted upwards in relation to the predatory pricing practices of the foreign manufacturers and importers. This anticipation is becoming a real-

ity as noted in the import price for d-cal pan for the first month of 1979 as shown in Exhibit 13, to wit, $14.50 per kilo.

To summarize the various sales data, the revised complaint makes the following statement:

> The pattern of the sale prices of feed grade dl-cal pan shows the persistent importing and selling of cal pan at unreasonably low prices, e.g., (1) during Fiscal Year 1976 the sale price of imported feed grade dl-cal pan was below Complainant's manufacturing costs and (2) during Fiscal Year 1978 the sale price of imported feed grade dl-cal pan failed to reflect anticipated increases resulting from Japanese inflation and exchange rate advantage.

In discussing several exhibits relating to Japanese cal-pan, the revised complaint states:

> During Calendar Year 1978 there were actual sales of imported feed grade dl-cal pan at $3.85 and $3.90 per kilo. However, based upon prior sales of Japanese cal pan that are adjusted to reflect the changes in the Japanese Wholesale Price Index and the conversion rate changes of the yen in relation to the dollar, Japanese feed grade dl-cal pan should have sold in Calendar Year 1978 as follows:
>
> $9.43 per kilo based on 1973 sales
> $4.73 per kilo based on 1975 sales
> $5.97 per kilo based on 1977 sales
>
> It is submitted that the history of the sales of Japanese dl-cal pan shows an erratic pattern of pricing which is incomprehensible and unreasonable. Further, it is represented that there is reasonable grounds to believe or suspect that the aforesaid sales do not reflect the total costs for manufacturing cal pan.

In conclusion,[7] section 8 of the revised complaint "submits that there is reason to believe that the Respondents, and possibly others, have conspired to destroy the cal pan industry in the United States for purposes of enjoying the illegitimate gains of monopolization."

---

7. Syntex also submitted data allegedly showing that, except for labor costs, the variable costs of producing cal pan in Japan would be approx-imately the same as in the U. S.; further, that Japanese cal pan sold for less than Syntex's variable costs.

In sections 9 and 10 of its revised complaint, Syntex discusses several exhibits, including its annual report and data concerning its percent return on sales and the loss of market share by U. S. producers in the d-cal pan and dl-cal pan markets. In section 9, Syntex concludes that unreasonably low prices of Japanese cal pan are the direct cause of its losses and low profits. In section 10, Syntex states that "as a direct consequence of the importation and selling of cal pan at said unreasonably low prices, there are now no U. S. producers of d-cal pan and the only surviving producer of racemic dl-cal pan [Syntex] is struggling to attain sales which amount to approximately 30% of the U. S. market."

The above review of Syntex's revised complaint discloses no facts which show the alleged acts of either monopolization or conspiracy. Rather, Syntex has merely alleged that the cost of basic materials for making cal pan, as well as labor costs, must be approximately the same in the U. S. and Japan and that the methods of manufacturing must be the same, so that the lower prices must be predatory; further, that since the distributor in the United States of Japanese cal pan would maximize its profits by charging at the rate Syntex charged for competitive products, it must be presumed that the reason it did not do so was conspiratorial—to drive competition out of the market; that once this was accomplished, it can be presumed that the price for the Japanese cal pan would be increased. Syntex asserts that this anticompetitive activity has driven it from the d-cal pan market and substantially injured its position in the dl-cal pan market. However, Syntex's complaint is no more than a theory built on suppositions and assumes that Japanese companies could not be substantially more efficient than Syntex. Also there is no unremediable damage to Syntex from dismissal of its complaint since it can always file a new complaint.

Although we recognize that antitrust claims are difficult to substantiate and that the Congress enacted the Trade Act of 1974 with the objective of helping U. S. businesses compete in the world marketplace, we,

nevertheless, must hold that ITC's dismissal of Syntex's October 24, 1979, complaint was correct. The allegations set forth in the revised complaint regarding less-than-fair-market-value pricing might support an antidumping claim, but no more. They clearly do not support a monopolization or conspiracy claim.

Because of our disposition of Syntex's petition for a writ of mandamus on the basis of failure to comply with 19 CFR 210.20(a)(2), it is unnecessary to consider the relationship between investigations conducted under section 603 and those under section 337. We note, however, that, although it is clear that section 603 investigations may be used for preliminary matters in conjunction with section 337 investigations, there appears to be no basis—statutory or otherwise—for substituting a section 603 investigation for a section 337 investigation.

ITC's section 603 investigation was conducted on its own initiative *following dismissal* of Syntex's complaint. The report of the investigation shows that outdated technology and problems with government regulations were the major contributing factors that caused Syntex to cease production of d-cal pan; that, although one Japanese company, Daiichi (not named in Syntex's complaint), had acquired for a time what could be considered a monopoly share of the d-cal pan market, there were new producers who could be expected to erode Daiichi's market share; also that Daiichi's prices did not immediately lower upon entry of competitors into the d-cal pan market, a finding consistent with absence of, rather than presence of, anticompetitive behavior. With respect to the dl-cal pan market, the investigation report discloses numerous producing competitors, with Alps at no time holding a monopoly share of the market.

Finally, the report shows that better technology was to be found in Japan; that competition was increasing from new entrants into the market in the United States and abroad; and that deficiencies existed in Syntex's cost analysis. Although not re-

quired by statute to do so in light of Syntex's defective complaint, ITC made a substantial and conscientious effort to determine whether there was a reasonable basis to go forward with a section 337 investigation on its own initiative, as provided by section 337(b)(1).

The petition for writ of mandamus is denied.

NIES, Judge, concurring, with whom BALDWIN, Judge, joins.

The majority opinion focuses on the question whether a complaint filed October 24, 1979, by Syntex for the purpose of a § 337 investigation (19 U.S.C. § 1337) was deficient under the statute and the ITC rules. I agree that the complaint was properly dismissed, but for reasons which are stated herein.[1]

In addition, petitioner also asserted as grounds for mandamus that the ITC had no authority to conduct a preliminary investigation under § 603 (19 U.S.C. § 2482) in connection with a § 337 investigation, and that, in any event, the ITC's conclusion (which resulted from the § 603 investigation) that there was no basis for a § 337 investigation is arbitrary, capricious and an abuse of discretion. In my view these issues must also be addressed inasmuch as they provide separate grounds for the mandamus petition.

### Background

The following chronology of events is shown by the record:

6/1/79 Syntex filed first § 337 complaint.

6/27/79 ITC voted not to institute requested investigation and dismissed complaint on grounds only antidumping matters were pleaded, (i.e., failure by Treasury to enforce antidumping order against Japanese imports).

7/30/79 Syntex complaint sent to Treasury with request for status report on enforcement and plans for addressing matters in Syntex complaint.

10/24/79 Syntex filed second § 337 complaint deleting reference to Treasury and substituting conspiracy between Japanese producer (Alps Pharmaceutical Co. Ltd.) and U.S. importer (Mitsui & Co.) in predatorily pricing subject imports.

11/20/79 ITC voted not to institute § 337 investigation at that time and to contact Secretary of Treasury again requesting status report on enforcement of antidumping order.

12/27/79 Status report from Treasury indicates enforcement being effected.

2/12/80 ITC voted to dismiss Syntex complaint of 10/24/79.

2/12/80 ITC voted to institute a preliminary investigation under § 603 into alleged anticompetitive practices asserted by Syntex.

2/20/80 Notice to public of § 603 preliminary investigation re same. (45 Fed. Reg. 12,931 (2/27/80).)

9/19/80 Section 603 investigation terminated without instituting § 337 investigation.

1/7/81 Petition for Mandamus filed.

### The Grounds for Dismissal of the Second Complaint

The complaint filed by Syntex on October 24, 1979 (second complaint), was dismissed by the Commission on February 12, 1980, on the grounds that the complaint was not properly filed under ITC rule 210.12, stating further that the decision was based on § 337(b)(3) which gives the Commission discretion regarding whether to institute an investigation based on a complaint where the alleged unfair acts are in part within the purview of the antidumping laws.

In this proceeding, the parties have treated the dismissal as resting on two separate grounds. First, the parties raise a question of interpretation of the statute. Does the ITC have any *discretion* whether or not to institute a § 337 investigation where the

---

1. I further believe it would be grossly unfair to preclude review of the propriety of its complaint at this time. As indicated in the majority opinion, Syntex has attempted to obtain review by a previous petition for a writ of mandamus and by an abortive appeal.

alleged unfair acts are in part within the purview of the antidumping laws? The second addresses the issue whether the complaint is inherently deficient, that is, whether it fails to satisfy the minimum pleading requirements of ITC rule 210.20.[2]

### Discretionary Authority Under § 337

Section 337(a) of the Tariff Act of 1930, as amended, (19 U.S.C. § 1337(a)), prohibits unfair methods of competition and unfair acts in the importation of articles into the United States. Appellant asserts that the ITC must institute an investigation upon its complaint because of the mandatory language of § 337(b)(1) which provides:

> The Commission *shall* investigate any alleged violation of this section on complaint under oath or upon its own initiative. [Emphasis added.]

Conversely, the Government argues that § 337(b)(1) is tempered by § 337(b)(3).

The statutory language of § 337(b)(3) is prolix but unambiguous.[3] The Commission is required to terminate or not institute an investigation under § 337 where the acts complained of are solely within the purview of 19 U.S.C. § 1673 (antidumping provisions). The first Syntex complaint based on injury by reason of less than fair value (LTFV) sales prices and failure of Treasury to collect dumping duties, was dismissed for this reason.

The Commission *may* institute an investigation when the alleged acts are in part within the purview of § 1673, but, in addition, other acts are alleged which independently or conjointly provide a basis for relief under § 337. The second complaint by Syntex was identical to the first complaint in its allegations except for the substitution

of allegations of conspiracy and attempted monopoly by a Japanese manufacturer and its U.S. distributor by means of excessively low prices in place of the previous allegations of dereliction on the part of the Secretary of Treasury. While Syntex does not dispute that its second complaint is based in part on acts within the purview of § 1673, it argues that the proper course of action is not dismissal, but merely suspension, pending review by the administering authority to which a matter is referred. In view of the statutory language "may institute," I cannot agree.

The dismissal followed receipt of the 12/27/79 status report from Treasury advising that relief was being given against the damaging imports. An agency must, as the Government asserts, be given some latitude in expending its resources with respect to discretionary matters. The action of ITC, in my view, demonstrates no abuse of discretion even if the complaint were not deficient.

### The Sufficiency of the Second Complaint

The mandatory contents of a § 337 complaint are set forth in 19 CFR 210.20 which provides for substantial detail. The complaint, inter alia, must:

be under oath;

include a statement of facts constituting the alleged unfair methods of competition and unfair acts;

describe specific incidents of alleged importations and sales;

include a description of the trade or commerce affected when the element of a complaint has the effect to restrain or monopolize such trade and commerce;

---

**2.** Under 19 U.S.C. § 1335 the Commission is authorized to adopt such reasonable procedures and rules and regulations as it deems necessary to carry out its functions and duties. Syntex does not question the reasonableness of the pleading requirements but disagrees with the determination that its complaint did not satisfy the rules.

**3.** "... If the Commission has reason to believe the matter before it is based solely on alleged acts and effects which are within the purview of section 1303, 1671, or 1673 of this title, it

shall terminate, or not institute any investigation into the matter. If the Commission has reason to believe the matter before it is based in part on alleged acts and effects which are within the purview of section 1303, 1671, or 1673 of this title, and in part on alleged acts and effects which may, independently from or in conjunction with those within the purview of this section, establish a basic relief under this section, then it may institute or continue an investigation into the matter...."

include a description of the complainant's business and his interest in the trade and commerce or domestic industry affected; and

include data concerning the volume of sales, etc., and other data pertinent to the allegation that the effect or tendency of the importations or sales in question is to restrain or monopolize trade and commerce in the United States.

The Government argues that notice pleadings, of the type which are sufficient under Rule 8(a) of the Federal Rules of Civil Procedure (FRCP), are inadequate for ITC purposes; and ITC rule 210.20 reasonably requires much more. In view of the stringent time restrictions placed on the ITC,[4] this argument is persuasive. In any event, a review of the pleadings here shows that the complaint is insufficient even under the liberal standards of Rule 8(a), FRCP, which requires no more than a short and plain statement of the claim, showing that the pleader is entitled to relief.

Abundant authority can be found for dismissing a complaint which is no more than a general allegation of unlawful combination and conspiracy under the federal antitrust laws. See, e. g., *California Dump Truck Owners Ass'n, Inc. v. Associate General Contractors, Inc.*, 562 F.2d 607 (CA 9 1977) in which the complaint was found overly broad and vague where plaintiffs averred generally unlawful combination and conspiracy; *Westinghouse Electric Corp. v. CX Processing Laboratories, Inc.*, 523 F.2d 668 (CA 9 1975), in which a counterclaim for antitrust conspiracy by plaintiff and other manufacturers did not satisfy Rule 8(a)(2) where it provided a general historical description of the manufacturers and the charging portion of the counterclaim referred only to plaintiff and its distributors; *Augspurger v. Brotherhood of Locomotive Engineers*, 510 F.2d 853 (CA 8 1975), allegations that the defendant union acted in an unfair, invidious, unequal, and arbitrary manner toward the plaintiffs were held mere conclusion of law and insuf-

ficient under Rule 8(a); *Louisiana Farmers' Protective Union, Inc. v. Great Atlantic & Pacific Tea Co. of America*, 131 F.2d 419 (CA 8 1942), in which the court stated that a plaintiff in an antitrust suit need not set out in detail the acts complained of, although he must do more than plead conclusions in the words of the statute.

As detailed in the majority opinion, petitioner's allegations are no more than conclusory.

### Authority Under § 603

After the complaint of October 24, 1979, was dismissed, the Commission on its own went forward with an inquiry under § 603 to see if it could find support independently for Syntex' conspiracy and monopoly claims.

Section 603 (19 U.S.C. § 2482) provides the following authority to the ITC:

(a) In order to expedite the performance of its function under this chapter, the International Trade Commission may conduct preliminary investigations, determine the scope and manner of its proceedings, and consolidate proceedings before it.

(b) In performing its functions under this chapter, the Commission may exercise any authority granted to it under any other Act.

Petitioner asserts that the above language of § 603 restricts the use of this authority to investigations under 19 U.S.C. Chapter 12, and, therefore, cannot be used in connection with a § 337 investigation, that section being found in Chapter 4. I agree with the Government, however, that § 603, enacted as part of the Trade Act of 1974, is a provision of more general applicability and may be used in connection with the ITC's jurisdiction under § 337. The historical note to section 1 of the Trade Act of 1974 advises that the words "this Chapter" in § 603 do not appear in the original, that is, the statute which was actually passed. In the original, the words are "this Act"

---

**4.** Under § 337(b) ITC is required to complete a § 337 investigation within one year. Eighteen

months is allowed only in cases specifically declared to be more complicated.

meaning the Trade Act of 1974, which in addition to enacting the provisions in Chapter 12 also amended sections of the Tariff Act of 1930, including § 337. The Commission was, therefore, acting within its legal authority in making a preliminary investigation under § 603 in order to decide whether to institute a § 337 investigation.

The report of the results of the § 603 preliminary investigation, which is part of the record here, became the basis for the Commission's ultimate conclusion on September 19, 1980, that there was no evidence of any conspiracy and the Commission, accordingly, voted not to institute a § 337 investigation. The report is extensive and thorough and shows no abuse of authority in the final acts of the Commission on this matter.

*The Section 603 Report*

A preliminary investigation under § 603 was conducted by the Commission from February 20, 1980, until August 20, 1980, for the purpose of determining whether imports of calcium pantothenate from Japan were the subject of a combination, contract or conspiracy to restrain trade and commerce in the United States, or the subject of a scheme to monopolize the d-cal pan and/or dl-cal pan markets in the United States as a result of which U. S. companies have been forced out of these markets. It is stated in the Commission report, U.S. I.T.C. Publication 1104, October 1980, that the investigation was conducted following dismissal of a complaint by Syntex in order to determine whether Syntex's charges merited a § 337 investigation in spite of the paucity of hard information in the complaint.

The ITC report determined that the relevant product market in issue in the investigation was cal pan, with submarkets of d- and dl-cal pan, the area of effective competition being the continental United States. Information acquired through interviews established that those companies that ceased production of cal pan did so primarily because of environmental problems which required the construction of prohibitively expensive new plants and the use of new technologies which were unavailable to them. Since the cost of imported cal pan was reasonable, these companies decided to cease production and to supply their customer and own needs by purchasing d- and/or dl-cal pan from foreign and domestic producers. In 1978–79 two U.S. producers, Diamond Shamrock and Thompson-Hayward, which had been producers of dl-cal pan and ceased this operation, re-entered the market with d-cal pan after acquiring new technology and constructing new state-of-the-art production facilities. Syntex's allegation (in October 1979) that there were no domestic producers of d-cal pan since it ceased production in 1975 was erroneous.

The report further found that a Japanese manufacturer, Daiichi Seiyaku, which was virtually the only supplier of d-cal pan during 1976–79, had become so because of *patented technology* which made it, as a practical matter, the only d-cal pan source for the world market. Syntex, which in the early '70's was the only U.S. source for d-cal pan, ceased production in 1975. The report further found that the technology used by Syntex was that of the state-of-the-art in the late 1940's and was obsolete. Syntex also encountered insurmountable problems from EPA and FDA regulations with attendant financial consequences. Those events, and not price competition, coalesced to create the critical factors which caused Syntex to cease production of d-cal pan. While Daiichi then acquired what could be considered a monopoly share of the market, this was found to be only temporary with new entrants eroding the Japanese company's position.

The report found that the pricing data on Japanese d-cal pan showed no indication of artificial raising of prices to recoup losses sustained for the purpose of attaining market domination. Rather, the price in the United States increased only gradually and, according to the new domestic entrants into the d-cal pan market, the prices had not yet risen to the level these companies would like to see. Moreover, the Japanese prices

did not show an immediate lowering upon entry of competitors into the d-cal pan market. This absence of attack on new competitors underscored an absence of anticompetitive behavior by the Japanese company. The report also noted the increased presence of Roche Products, Inc., a Scottish company, in the d-cal pan submarket, which is expected to lead to rapid erosion of the Japanese producer's market share.

Syntex has at all times remained a producer of dl-cal pan. With respect to this submarket, the investigation disclosed a plethora of producing competitors located in Japan, the United States, and Eastern bloc countries. The sole Japanese producer of dl-cal pan at no time held a monopoly share of the market.[5] The report finds the dl-cal pan (as well as the d-cal pan) submarket to be the subject of healthy and vigorous competition.

The officers of Syntex had no evidence of even the most circumstantial nature which would indicate anticompetitive conduct by Japanese producers in either the d-cal pan or dl-cal pan submarkets.

The staff found no evidence of predatory pricing, that is, pricing below average variable costs. The economic data urged by Syntex was not supportable because of basic flaws in its position which depended upon an assumption that Japanese companies could not be substantially more efficient than Syntex. The staff analyzed the structure of the cal pan market in Japan and found that it was more specialized and utilized better technology. In particular, the processes used enabled Japanese producers to recycle by-products and obtain significantly increased yields.

Another factor noted was that Syntex is only in the dl-cal pan market, whereas there is a growing consumer preference for d-cal pan. Thus, erosion of its market for dl-cal pan was predictable.

Finally, the report stated that no U.S. firm, including Syntex, nor any individual could be found with any information from which one could be led to believe that there is any cooperation between the Japanese producers and distributors in the U.S. market, and no evidence which would establish a scheme by Japanese producers and their distributors to absorb any dumping duties.

These conclusions are found in a more than 80 page analysis of supporting data showing that better technology was to be found in Japan, competition was increasing from new entrants into the market in the United States and abroad, and deficiencies existed in Syntex's cost analyses. Clearly, a substantial and conscientious effort was made to determine if there was a reasonable basis to go forward with a § 337 investigation, notwithstanding the insufficiency of the dismissed complaint. I see no action of the ITC which is arbitrary, capricious or an abuse of discretion in not instituting a § 337 investigation, given the results of the § 603 preliminary investigation.

### Conclusion

The ITC not having acted beyond its statutory or discretionary authority, the petition for a writ of mandamus must be dismissed.

---

5. This company, Alps Pharmaceutical Co. Ltd., and its U.S. distributor, Mitsui & Co., were the only named conspirators in the Syntex § 337 complaint.